UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
Case No. 4:14-cv-00493-RH-CAS

SHALINUS PYE and
RAISHA LICHT,
individually and on behalf
of all others similarly situated,

                  Plaintiffs,

v.

FIFTH GENERATION, INC.,
a Texas corporation, and
MOCKINGBIRD DISTILLERY CORP.,
a Texas corporation,

                  Defendants.

---

**DEFENDANT FIFTH GENERATION, INC.'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE,
FOR A MORE DEFINITIVE STATEMENT**

---

## I.   **INTRODUCTION**

This case is a would-be class action initiated by two Florida consumers, Shalinus Pye and Raisha Licht, who claim they bought Tito's Handmade Vodka made by Defendant Fifth Generation, Inc.[1] ("Fifth Generation").  In response to the Class Action Complaint (ECF 1) ("Initial Complaint"), Fifth Generation, Inc. filed its Motion to Dismiss (ECF 13), showing a number of defects in the Initial Complaint.  Rather than respond to the Motion to Dismiss, Plaintiffs chose to file their First Amended Complaint (ECF 22).  However, the First Amended Complaint essentially makes only two changes to the infirmities in the Plaintiffs' allegations.

First, the First Amended Complaint abandons Plaintiffs' baseless allegations regarding Tito's Handmade Vodka being produced using "two Dr. Pepper kegs and a turkey frying rig to cook bushels."  [*See* Initial Complaint (ECF 1), ¶ 4; *cf.* ¶¶ 47 n.4, 48.] This change is immaterial, as it does not cure any deficiency in the allegations.

Second, the First Amended Complaint seeks to cure lack of factual allegations by alleging that Plaintiff Pye bought *two* bottles of Tito's Handmade Vodka, and that "Plaintiff Licht also purchased a 750 milliliter bottle of Tito's Handmade Vodka for $20.99 in or about July 2012 at Proof Brewing Co. more than once between the specified time frame."  [First Amended Complaint, ¶ 16].  Even if the allegations regarding their respective purchases were pooled, however, the First Amended Complaint still does not

---

[1] The First Amended Complaint (still) nominally includes as a defendant Mockingbird Distillery Corp., which Plaintiffs aver is a "corporation organized under the laws of Texas with its principle [sic] place of business located at 12101 Moore Road, Austin, Texas 78719."  [First Amended Complaint, ¶ 18.]  In reality, "Mockingbird Distillery" is merely a Florida d/b/a for Fifth Generation, not a separate corporation.  As such, Fifth Generation is responding herein for itself and its d/b/a.

set forth sufficient facts to answer the basic "who, what, when, where, how many, how much and why" questions with particularity.  The Plaintiffs still do not claim there was anything wrong with the vodka they allegedly purchased, or that they did not like it for some reason.  And even after Fifth Generation's initial Motion to Dismiss pointed out these deficiencies, Plaintiffs' First Amended Complaint still does not allege that they complained about the vodka, tried to return it, or notified anyone of their dissatisfaction – a statutory prerequisite for some of their claims that had been already called to their attention.  And still, Plaintiffs do not allege any personal injury resulting from their use of the vodka, such that the First Amended Complaint leaves the allegations to sound squarely in contract rather than product liability, with the result that the First Amended Complaint falls short.

Plaintiffs' First Amended Complaint does not cure the structural deficiencies either.  The factual allegations, such as they are, still are incorporated by reference into every cause of action in a shotgun-style pleading, which Fifth Generation reminded them is a practice so roundly condemned in the Eleventh Circuit that it, on its own, invites and merits dismissal.

Other changes Plaintiffs did not make, and the numerous deficiencies they do not address, are incurable. Most notably, Plaintiffs offered nothing to address the fact that Alcohol and Tobacco Tax and Trade Bureau ("TTB") has affirmatively approved of the label on Tito's Handmade Vodka, or to explain how this express pre-approval does not afford  Fifth Generation the benefits of Florida's safe harbor.  Since they ignored the

3

issue twice, the Court should conclude that  Plaintiffs can offer nothing in response to this defense and their claims must be dismissed.

      With so many details still missing, and no facts pled that would make the safe harbor inapplicable, Plaintiffs leave the Court in no position to assess whether any of their claims pass even the plausibility standards of Federal Rule of Civil Procedure 8.  By the same token, of course, Plaintiffs provide the Court with no information to satisfy the pleading requirements applicable to fraud-based claims – particularly the statutory false advertising claim, which must satisfy the more stringent pleading standards of Rule 9(b).

      As Fifth Generation has pointed out, these shortcomings do matter.  Even though they borrow some "facts" freely from the June 2013 *Forbes* article,[2] it now appears that the article itself played no role in their decision to buy or not to buy Tito's Handmade Vodka, so their continued citation to it (brought forward from the Initial Complaint) is misplaced.  What is significant, however, is that these Plaintiffs, who bought before the article was published, are not in the same position as consumers who saw the article, and bought (or continued to buy) Tito's Handmade Vodka anyway.  This is simply one example of why their First Amended Complaint is still too short on facts (as opposed to assertions adopted from the article), to permit either Fifth Generation or the Court to assess their boilerplate recitation that they are "typical" of anyone else (as they allege in paragraph 68).  By the same token,  the number of times they purchased may raise additional plausibility concerns:  If they enjoyed the taste of the product and thought it

---

[2] Plaintiffs' First Amended Complaint reiterates from the Initial Complaint several references to a June 26, 2013 *Forbes* article concerning Tito's, beginning at paragraph 3.

was a good value, did the label truly influence any but their first purchase?  Plaintiffs' skeletal allegations, ever-so-mildly enhanced in the First Amended Complaint, raise all of these questions, but answer none.  Instead, Plaintiffs have confirmed that they have essentially no information as to transaction facts other than having purchased a handful of bottles in 2012.  Consequently, Plaintiffs utterly fail to show how they could be typical of any purported class.

The lack of particularity makes the First Amended Complaint deficient with respect to each claim.  Accordingly, the relief sought by Fifth Generation remains straightforward:  dismissal of the First Amended Complaint or, in the alternative, an Order requiring a more definite statement that at a minimum covers the "who, what, when, where, why and how much" level of detail required to satisfy the appropriately stringent standard of Federal Rule of Civil Procedure 9(b).  Once those details are supplied, it will be apparent that more of Plaintiffs' claims are unviable and subject to dismissal.

## II.    FACTUAL BACKGROUND

### A.    History of Tito's Handmade Vodka.

Tito's Handmade Vodka is an American success story.  It is the brainchild of Bert "Tito" Beveridge, who set out to make a high quality vodka that can, and does, compete with the world's most renowned vodkas on the most important attribute: taste.  Yet, true to its Austin, Texas roots, Tito's Handmade Vodka is value priced and sells at retail for substantially less than other, highly rated vodkas.  The "secret" method for making such

great tasting vodka was to return to the pre-Civil War methods of distilling and to make it

in an old-fashioned pot still, as opposed to a continuous run column still. Tito's process

takes longer, is more labor intensive, and results in smaller yields, but Tito felt it was

worth it, because the end product was superior. Over the years, critics proved Tito's

belief was justified, as Tito's Handmade Vodka has consistently rated higher than other

vodkas, won a Double Gold Medal at the San Francisco World Spirits Competition and

also won best vodka and tonic at the Ultimate Cocktail Challenge in New York City.[3]

It appears from the First Amended Complaint that Plaintiffs are making two basic

attacks on Tito's Handmade Vodka: (i) against the source of the alcohol used as a raw

material to make the product; and (ii) against the process by which it is made or, more

accurately, the size of the operation. [First Amended Complaint, ¶ 2.] Plaintiffs contend

that Tito's Handmade Vodka cannot be "handmade" because it is "made from

commercially manufactured neutral grain spirit that is trucked and pumped into

Defendants' industrial facility." [First Amended Complaint, ¶ 2.] They also contend that

Tito's Handmade Vodka is "distilled in large industrial technologically advanced stills"

and "mass produced." [*Id.*]

Plaintiffs' objection to "neutral grain spirits" is particularly puzzling, because

vodka, by its legal definition, begins with neutral spirits. The legal standard of identity

for "vodka" is set forth in 27 C.F.R. section 5.22(a)(1), which provides:

---

[3] To provide another example, Wine Enthusiast has given Tito's Handmade Vodka a
score of 95 out of 100. Other premium vodkas rated by the same publication include
Ketel One, at 89 points, and Grey Goose, at 84 points - vodkas that typically sell at
significantly higher retail prices than Tito's Handmade Vodka.

>   (a)     Class 1; neutral spirits or alcohol. "Neutral spirits" or "alcohol" are distilled spirits produced from any material at or above 190 proof, and, if bottled, bottled at not less than 80 proof;
>
>   (1)     "Vodka" is neutral spirits so distilled, or so treated after distillation with charcoal or other materials, as to be without distinctive aroma, taste or color.

Thus, by legal definition, all "vodka" begins as a raw ingredient neutral spirit in order to meet the standard of identity in the finished product. The handcrafting process Fifth Generation employs for this distillation process in its use of old-fashioned pot stills, where the process is governed by the distillers' taste, discretion and practiced professionalism on each batch, is principally what sets Tito's Handmade Vodka apart, and makes it "handmade."

With this legal definition in mind, we look at what Plaintiffs seem to think is the problem. At paragraph 4, Plaintiffs aver, "Upon information and belief, Defendants may have actually produced "handmade" vodka at some point in the past." [First Amended Complaint, ¶ 4.] But Plaintiffs do not state where they believe some imaginary line is crossed beyond which Tito's is no longer "handmade." In fact, every ounce of Tito's Handmade Vodka is and always has been distilled in old-fashioned pot stills, each of which works on exactly the same principles as Fifth Generation's original single pot still. All of Fifth Generation's stills are fabricated by Fifth Generation on site at its distillery in Austin, Texas, using its own specific designs and processes. The neutral spirits (from which vodka, by legal definition, is made) are slowly and gently heated in those pot stills, as part of Tito's proprietary distillation process. This is slow and labor-intensive compared to modern automated column stills, but it is part of the secret to making micro-distilled vodka, just as it is for making single malt scotch or fine cognac.

By slowly distilling the spirits in its old-fashioned pot stills, Fifth Generation is able to isolate the purest, finest portion of the batch, which it refers to as the nectar.  It is condensed and collected and retained.  This process is repeated as many times as necessary in order to get the desired product. Each time the batch is distilled, individual Fifth Generation employees make subjective decisions based on practiced professionalism as to how much of the "head" and "tail" of the batch to "cut" and discard.  These "head" and "tail" cuts are made on the alcohol, so that only the purest and finest tasting end product goes into Tito's Handmade Vodka.

Taste and purity are not automated processes determined by machines as is often the practice in stills that are continuously run.  Each batch of Tito's Handmade Vodka is tasted at multiple stages by Fifth Generation's expert tasters.  This is all done by hand.  It is a person who determines by taste how long and at what temperature the raw alcohol is to be cooked so that it is molded based on its body and flavor into taste-tested, high-quality alcohol ready to be mixed with filtered water and made into Tito's Handmade Vodka.

As best we can tell from reviewing the First Amended Complaint, Plaintiffs seem to be claiming that Fifth Generation's laborious and time-consuming process no longer matters because the product's burgeoning success with consumers and critical acclaim have simply made the operation too big to be "handmade."  In other words, in Plaintiffs' view, size matters, not process, and, in doing so, they have no appreciation of scale.[4]

---

[4] Plaintiffs again rely not on their own personal knowledge, but on the 2013 *Forbes* article, and allege that "defendants also concealed the fact that the vodka is no longer made in old-fashioned pot stills of the variety Tito's proudly displayed in then 2013

Plaintiffs cannot identify any authority to establish this supposed size-based dividing line – because none exists.  Not legal.  Not regulatory.  Nothing.

Admittedly, as the Tito's brand has grown, this process has been scaled up to meet consumer demand (and to keep the retail price at a value range), but the process is the same.  Every bottle sold contains vodka that was distilled in an old-fashioned pot still in batches, and every batch is distilled and processed until it satisfies the tasting standards of the individual Fifth Generation distillers who personally test every batch to ensure consistent quality.  This process is what makes Tito's Handmade Vodka handmade.

**B.**      <u>**History of Tito's Label**</u>

The label on Tito's Handmade Vodka is also "handmade" in its origins.  The graphic of the old-fashioned pot still was drawn by Tito Beveridge himself.  He chose the fonts, the colors and the other elements of the label that communicate the consumers the essence of the brand.

Although Tito held the creative pen for the label, he did not have final control over what the label said.  Alcoholic beverage labels and advertising are regulated and approved for use by the federal government.  Specifically, the Secretary of the Treasury Department is empowered to regulate, *inter alia*, alcoholic beverage labeling and

---

*Forbes* article…."  [First Amended Complaint, ¶ 48.]  These averments do not rise to the level of "facts," but are rather erroneous conclusions formed by a reporter who seems to not have known the facts.  As such, the only thing the Court should assume is "true" from the First Amended Complaint is that the statements appeared in the article, and not that the underlying facts (which are not known to Plaintiffs) are true.  Indeed, the key allegation as to the process appears in paragraph 47, which is made "on information and belief," and in turn comes solely from the *Forbes* article.  [*See* First Amended Complaint ¶ 47, n.4.]  Plaintiffs freely admit they know nothing themselves by alleging that "discovery will further reveal the specific automated manner in which the vodka is made."  [*Id.*]

advertising.  27 U.S.C. § 205(e) and (f).  This authority has been delegated to the Alcohol and Tobacco Tax and Trade Bureau ("TTB").  *See* 6 U.S.C. § 531(d); Treas. Dept. Order 120-01, 68 Fed. Reg. 3583-02 (Jan. 24, 2003).  Unlike other food and beverage products, the labels on alcoholic beverages must be ***pre-approved*** by the TTB.  No label can appear on bottles or packages of alcoholic beverages sold to consumers unless the label has been expressly approved by the TTB first, and the TTB has issued a Certificate of Label Approval ("COLA").

In the case of Tito's Handmade Vodka, the TTB expressly approved its label, including the "handmade" claim that Plaintiffs challenge.[5]  This was no bureaucratic wave through.  In late 2005, a representative of the TTB re-visited the use of "handmade" on the label due to the growth the company had seen since the TTB's original label approval of the label almost a decade prior.  Several agents then came, in early 2006, to Fifth Generation's distillery in Austin and reviewed every step of its distillation and production process and compared it against the "Handmade" claim.  After this thorough, in-person review, and with full knowledge of the size of the pot stills and the size of Fifth Generation's overall operations, the TTB dropped any question of the use of "Handmade" for Tito's Handmade Vodka.   The same size pot stills with the same configuration and process continue to be used today.  Additionally, the TTB has performed repeat site visits that involved detailed distillation process inspection and

---

[5] Plaintiffs make the unadorned averment that "with respect to Defendants' Tito's Vodka, Defendants have violated the TTB and FDCA and regulations promulgated thereunder." [Complaint, ¶ 33.]  This is a perfect example of why Rule 9(b) requires Plaintiffs to plead facts substantiating precisely how they contend the label violates such regulations, because whatever they claim will come as news to Fifth Generation and, more importantly, to the TTB, which approved the label.

review of label and advertising claims in 2011 and then issued new COLAs once again

approving the label for Tito's Handmade Vodka – as recently as 2013 when the term

"Gluten-Free" was allowed to be added to the label.  Over multiple years, and multiple

labels, the process for making Tito's Handmade Vodka has remained the same.  But the

entire time the label has always said "Tito's Handmade Vodka," and the TTB has

repeatedly given its express approval for those labels.

## III.   <u>LEGAL ARGUMENT</u>

### A.   <u>Motion to Dismiss Standards</u>.

Plaintiffs' pleading is subject to the heightened pleading requirements of Federal

Rule of Civil Procedure 9(b), because the claims, at bottom, sound in fraud.  Courts have

consistently held that claims for violations of Florida's false advertising statute –

Section 817.41, *et seq.,* Florida Statutes – sound in fraud and must be pled with Rule 9(b)

particularity.  *See, e.g. Simpson v. FWM Labs., Inc.,* Case No. 09-61771-CIV, 2010 WL

1257774, *4-5 (S.D. Fla. March 29, 2010).  In order to satisfy Rule 9(b), a complaint

must state facts (not mere conclusions) sufficient to satisfy (i) *what* (i.e., the precise

statements, representations or omissions made); (ii) *who* (i.e., who made the statements

and to whom); (iii) *where* (i.e., where did Plaintiffs come into contact with the product,

and where did they purchase it); (iv) *when* (i.e., when did Plaintiffs buy the product, in

order to evaluate statute of limitations issues); (v) *how much* (i.e., did Plaintiffs' actually

suffer an injury-in-fact, which can only be known by facts sufficient to establish that they

actually bought the product and how much they paid); and (vi) *why* (i.e., do Plaintiffs

state facts to establish justifiable reliance).  *Id*. (citing *Ziemba v. Cascade Int'l, Inc.*, 256

F.3d 1194, 1202 (11th Cir. 2001)).  In *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir. 2009) the court noted that one purpose of Rule 9(b)'s particularity requirement is to "deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs."  *Id.* at 1125 (internal quotes omitted).  This purpose is certainly vindicated by requiring Plaintiffs to state their claims with particularity here before permitting them to begin committing discovery, as they hope to do.  [*See* First Amended Complaint, ¶ 47 ("Discovery will further reveal the specific automated manner in which the Vodka is made.").][6]

These facts, in turn, must be viewed in light of the "plausibility" standard, as established by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  For reasons set forth below, Plaintiffs need to plead facts to address one or more of the "who, what, where" questions in order to permit the Court or Fifth Generation to assess whether the facts at issue are sufficient to move the claim "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

---

[6] Florida district courts have gone both ways on whether Rule 9(b) applies to claims brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *Compare Llado-Carreno v. Guidont Corp.*, Case No. 09-20971, 2011 WL 705403, at *5 (S.D. Fla. Feb. 22, 2011) (Rule 9(b) does apply to FDUTPA claims), *and Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) ("Most courts construing claims alleging violations of the Federal Deceptive Trade Practices Act or its state counterparts [like FDUTPA] have required the heightened pleading requirement of Rule 9(b)."), *with Costa v. Kerzner Int'l Resorts, Inc.,* No. 11-60663-CV, 2011 WL 2519244, at *2 (S.D. Fla. June 23, 2011) (Rule 9(b) does not apply to FDUTPA claims).  Here, Rule 9(b) applies to the false advertising claim, and the same factual averments apply to each, so those facts should be stated with particularity regardless of the label Plaintiffs attach to their legal theories.

In addition to being inadequately pled from a factual standpoint, the First Amended Complaint is structurally defective because it is a shotgun-style pleading.  As has been noted, "The Eleventh Circuit 'has had much to say about shotgun pleadings, none of which is favorable.'"  *Jovine v. Abbott Labs, Inc.,* 795 F.Supp.2d 1331, 1337 (S.D. Fla. 2011) (quoting *Davis v. Coca-Cola Bottling Co.,* 516 F.3d 955, 979 n.54 (11th Cir. 2008)).  The Eleventh Circuit has catalogued many of the problems shotgun pleadings create:  "Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice."  *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 367 (11th Cir. 1996).  The Eleventh Circuit has condemned the kind of mischief shotgun pleadings create in the discovery phase of cases:  "The unacceptable consequences of shotgun pleadings are many.  First, and perhaps foremost, shotgun pleading inexorably broadens the scope of discovery, much of which may be unnecessary.  Who benefits from that?  Certainly not the defendant, especially if it compensates its counsel by the hour.  Certainly not the plaintiff – unless his lawyer is trying to attach some value to a frivolous claim."  *Davis*, 516 F.3d at 981-82.  The First Amended Complaint here simply reiterates the same inadequate factual averments in each claim in this shotgun style, and for that reason alone should be dismissed outright.  *Jovine*, 795 F. Supp. 2d at 1337.  The problems that infect the whole also infect each of its parts, as set forth below.

      **B.**      **<u>Each of Plaintiffs' Claims Fails for Lack of Detail.</u>**

            **1.**      **<u>Plaintiffs' First Amended Complaint Fails to Answer Questions Required by FDUTPA.</u>**

13

Plaintiffs' first cause of action is based on alleged violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  All of Plaintiffs' averments in the claim (paragraphs 78-90) are conclusory, but there are at least three key issues in particular that should be addressed in a Rule 9(b)-compliant amended pleading.

           a.        **Plaintiffs fail to state "how much" they paid.**

Plaintiffs claim they were damaged in an amount equal to "the difference in the market value of the product or service in the condition is which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."  [First Amended Complaint, ¶ 88.]  This is conclusory boilerplate, much of which (like the reference to "services") has nothing to do with this case.[7]  The starting point for any remedy (whether under FDUTPA or otherwise) is how much Plaintiffs paid.  In the First Amended Complaint, Plaintiffs included part of this information for the first time.  But, as Fifth Generation pointed out in its initial Motion to Dismiss, Plaintiffs each  need to state facts as to their respective purchases, as well as what they allege to be the "market value" of Tito's properly labeled.  Yet Plaintiffs have still not provided any kind of factual allegation regarding market value.

Proof of harm – here, in the form of facts – is necessary to sustain a FDUTPA claim.  *Robbins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).  A mere

---

[7] The First Amended Complaint refers in paragraph 90 to "providing notification of product's health risks" and includes suggestions that the product was not "reasonably safe" in paragraphs 116-17 that seem equally out of place.  Paragraph 46 of the First Amended Complaint includes small pictures of the front of the label.  The back label on each bottle, which Plaintiffs omit, sets forth the warnings about consumption of alcohol, and there is no allegation in the case that the warning was missing on the bottles Plaintiffs allegedly bought.

allegation that Plaintiffs paid more than a product was worth is insufficient without facts to establish both what they paid and what they claim the product was worth. *E.g.*, *Fitzpatrick v. Gen. Mills*, 263 F.R.D. 687, 695 (S.D. Fla. 2010), *reversed on other grounds*, 635 F.3d 1279 (11th Cir. 2011). As it is, Plaintiffs' First Amended Complaint merely parrots, in checklist fashion, conclusions in trying to state the elements of a *prima facie* case. This is insufficient to move the case across the plausibility threshold even under Rule 8, much less to meet Rule 9(b)'s particularity requirement.

       **b.**      <u>**Plaintiffs fail to adequately state when they bought.**</u>

Second, Plaintiffs need to state facts to show when they first bought Tito's Handmade Vodka. All we know about Plaintiffs' alleged purchases is that they claim Plaintiff Pye purchased two bottles, and Plaintiff Licht bought a bottle "more than once between the specified time frame." [First Amended Complaint, ¶ 16.] The First Amended Complaint does not explain what the "specified time frame" is – presumably, the statute of limitations period, or else paragraph 16's averment of "including but not limited to April 2012 and July 2012." [*Id.*] Such allegations, which offer dates but also expressly qualify the dates as not defining an actual closed period ("including but not limited to") provide no actual information. That may be sufficient to address purchases made within the applicable limitations period, but it is not enough to support liability.

Plaintiffs' heavy reliance upon the 2013 *Forbes* article also brings the timing of their purchases into play. Plaintiffs' position appears to be that the *Forbes* article exposed that Tito's Handmade Vodka was not actually "handmade." Fifth Generation has serious issues with that article, but for purposes of this motion, its existence exposes

flaws in the logic underlying Plaintiffs' claims.  If Plaintiffs continued to buy Tito's Handmade Vodka after the article ran, then by their own standards they were either not deceived by the label, or else information about the size of Fifth Generation's operations (as opposed to the process) was immaterial to their decisions to buy Tito's Handmade Vodka at whatever price they paid.  The same would be true of any other would-be class members who bought Tito's Handmade Vodka after reading the *Forbes* article.  Plaintiffs tiptoe around this timing issue, because the actual facts, which are uniquely known to them, may negate an element of Plaintiffs' FDUTPA claim because they must show both deception and causation.  *See Third Party Verification, Inc. v. Signaturelink, Inc.,* 492 F. Supp. 2d 1314 1326 (M.D. Fla. 2007) (plaintiff must allege facts to show both deceptive act and causation).  The issue of "when" is required by Rule 9(b), and is a significant issue in this case.

> c.  **Plaintiffs' First Amended Complaint fails to allege facts to show why they bought.**

Apart from conclusory averments, the First Amended Complaint tells us nothing about what motivated Plaintiffs to buy Tito's Handmade Vodka for the first time.  The issue of "why" Plaintiffs' bought is important to address the element of causation under FDUTPA.  At most, the label says the vodka is handmade because it is crafted in an old-fashioned pot still, which is true.

Facts about Plaintiffs' purchasing behavior are important and should be stated with particularity, because those facts bear upon the "why" question.   This information is potentially highly revealing as to Plaintiffs' claim that they are "typical" of all Florida

purchasers.  If Plaintiffs are merely one- or two-time purchasers, they may be *a*typical of the loyal Tito's customers who have repeatedly purchased Tito's Handmade Vodka.

These are all facts that should be stated in the First Amended Complaint rather than forcing Fifth Generation to chase them in discovery, because alleging these simple and specific facts that are solely within Plaintiffs' own knowledge may well set up defenses or even a motion for judgment on the pleadings.  And these are issues best addressed now because purchasing patterns matter both now and if the case ever reaches the class certification stage.

### 2.    Plaintiff's First Amended Complaint Fails to Avoid FDUTPA's Safe Harbor.

If Plaintiffs elect to further amend and simply challenge whether, in fact, the process for making Tito's Handmade Vodka qualifies as "handmade," the Plaintiffs run directly into FDUTPA's safe harbor, because the TTB expressly approved the label after a complete review of the manufacturing process and reconfirmed the label multiple times. Florida's safe harbor provision immunizes from liability under FDUTPA acts or practices that are required or permitted by federal law.  § 501.212(1), Florida Statutes; *see*, *e.g.*. *Brett v. Toyota Motor Sales, U.S.A.,* Case No. 08-CV1168-ORL-28-GJK, 2008 WL 4329876, *7 (M.D. Fla. Sept. 15, 2008); *Prohias v. Pfizer, Inc.,* 490 F. Supp. 2d 1228, 1233 (S.D. Fla. 2007) (FDUTPA's safe harbor provision bars "lawsuits challenging conduct which is specifically permitted by a federal or state regulatory scheme").

As noted above, representatives from the TTB have personally inspected the manufacturing process at Fifth Generation's facility multiple times and confirmed Tito's label as truthful and appropriate.  Because Fifth Generation gained an express, advance

approval for its label from the very body charged with regulating its label, it is difficult to imagine any set of facts Plaintiffs could allege that would take the label outside this statutory safe harbor.  What is certain is that they have not done so.  The most charitable interpretation of their claims is that Plaintiffs, for reasons they do not elaborate, disagree with the TTB's repeated decision to approve the label, including the "Handmade" statement.  Respectfully, their disagreement is not enough to deny Fifth Generation the benefits of the safe harbor.  If Plaintiffs have a factual basis that would, if true, produce a different result, they should further amend the First Amended Complaint and set it out now.

### 3.   Plaintiffs' False Advertising Claim Fails.

Plaintiffs' false advertising claim fails because it fails to set forth the "what" – namely, the precise advertising they are complaining about.  The First Amended Complaint repeatedly refers generically to "advertising" without being specific whether they mean the TTB-approved label, other advertising, or both.  Although the First Amended Complaint refers most often to the TTB-approved Tito's Handmade Vodka label, some of their allegations are so outlandish that more detail is required to know how they possibly could have formed such beliefs.  For example, Plaintiffs allege that when they bought Tito's Handmade Vodka, they thought it was "made by human hands that was not made in large industrial vats in mass quantities, etc."  [Complaint ¶ 61.]  The "etc." is the least descriptive, but, in reality, none of these allegations actually comes from Tito's label.  The First Amended Complaint does not specify where Plaintiffs came up with these notions.  Fifth Generation is entitled to know that before it can respond.

Such non-specific pleading is insufficient to state a claim for false advertising. Courts have consistently held that a plaintiff's failure to allege with particularity what advertising is at issue (i.e., time, place and content) is fatal to a misleading advertising claim. *See Weitz v. Celebrity Cruises, Inc.*, Case Nos. 10-20267-CIV and 10-26268-CIV, 2010 WL 1882127, *1 (S.D. Fla. May 11, 2010) (dismissing false advertising claim for failure to plead with particularity the time of alleged misrepresentations). The only thing we know about what Plaintiffs complain about is their averment that "Defendants knowingly and intentionally engaged in false advertising concerning the true nature of how Tito's Vodka is produced." [First Amended Complaint, ¶ 92]. The back label of Tito's Handmade Vodka describes the process Fifth Generation uses to make the vodka. Fifth Generation is entitled to know exactly what Plaintiffs are claiming is "false" about it before moving beyond the pleadings and into discovery.

### 4. Plaintiffs' Breach of Warranty Claims Fail to Answer the "Where" Question.

Plaintiff's third claim alleges breach of express warranty and their fourth claim alleges breach of the implied warranty of merchantability. However, the First Amended Complaint does not allege any personal injury, so the sole basis for these claims is contract, not tort. Indeed, Plaintiffs affirmatively acknowledge the contractual nature of their claims when they refer to a supposed "standardized contract between Plaintiffs and the members of the Class on the one end, and Defendants on the other." [First Amended Complaint, ¶ 104; *cf. id.,* ¶ 110 (referring to "this contract").

Under Florida law, Plaintiffs' contract claims require privity. *Kramer v. Piper Aircraft Corp.,* 520 So. 2d. 37, 39 (Fla. 1988); *Mesa v. BMW of N. Am., LLC,* 904 So. 2d

450, 458 (Fla. 3d DCA 2005). "A plaintiff who purchases a product, but does not buy it directly from the defendant, is not in privity with that defendant." *T.W.M. v. Am. Med. Sys., Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995). Thus, in order for Plaintiffs' warranty claims to be viable, they would have to allege facts that they purchased Tito's Handmade Vodka directly from Fifth Generation. Otherwise, Plaintiffs' warranty claims cannot stand, because they are legally deficient.

And, in fact, Plaintiffs do reveal in the First Amended Complaint that they each bought Tito's Handmade Vodka at "Proof Brewing Co." in Tallahassee, Florida [First Amended Complaint, ¶ 16], a third party. Therefore, because Plaintiffs clearly did not buy the product from Fifth Generation, their causes of action for breach of express and implied warranty cannot survive the lack of privity of contract. *T.W.M.*, 886 F. Supp. at 844. Since these deficiencies cannot be remedied – Plaintiffs cannot undo the fact that they purchased at Proof Brewing Co. – Plaintiffs' warranty claims should be dismissed with prejudice.

In addition, Plaintiffs' contract claims are independently fatal because they fail to allege they gave proper statutory notice to the "seller" prior to filing suit. Such notice is required by Section 672.607(3)(a), Florida Statutes, which states, "the buyer must within a reasonable time after he or she discovered or should have discovered any breach notify the seller of the breach or be barred from any remedy." A complaint that fails to allege pre-suit notice to the sellers must be dismissed. *Randolph v. J.M. Smucker Co.,* 2014 WL 1018007 (S.D. Fla. March 14, 2014) ("To plead a breach of express warranty in Florida, the complaint must include an allegation that notice was given to the seller of the

breach").  Here, the First Amended Complaint plainly fails this requirement by alleging

no facts in support of any supposed notice.

### 5.        Plaintiffs' Negligence Claim Is Deficient.

Plaintiffs' fifth claim for negligence is deficient, because the only "duty" they

claim was breached was the "duty" either to do what the other causes of action claim

Fifth Generation did not do, or the duty not to do what the other claims allege Fifth

Generation did.  Because Plaintiffs have alleged no independent duty that gives rise to a

negligence claim, this claim is deficient as well.  Plaintiffs should be required to replead.

### 6.        Plaintiffs' Claim For Unjust Enrichment Fails.

Plaintiffs' sixth cause of action, for unjust enrichment, is also deficient.  Under

Florida law, a plaintiff must plead: (i) a benefit that plaintiffs conferred directly upon

defendant, who had knowledge of the benefit (akin to privity to contract); (ii) defendant's

receipt of the benefit; and (iii) defendant's retention of the benefit under circumstances

that would make it inequitable to permit defendant to keep it.  *E.g.*, *Nichols v. Wm.*

*Wigley Jr. Co.,* Case No. 10-80759-CIV, 2011 WL 181458, *5 (S.D. Fla. Jan. 19, 2011).

Factually, this claim fails for the same reason as the breach of express warranty claim,

because there is no direct relationship between Fifth Generation and Plaintiffs and,

therefore, no benefit directly conferred upon Fifth Generation.

Plaintiffs' unjust enrichment claim also fails for legal reasons.  It is an equitable

remedy, and as such, it only exists in circumstances for which legal remedies are

inadequate.  Courts routinely dismiss purported unjust enrichment claims where legal

claims, with adequate remedies, are available.  *See*, *e.g.*, *Jovine, surpra,* 795 F.Supp.2d at

1342 ("[A]lthough a plaintiff ordinarily may plead in the alternative, here, if Plaintiff cannot prevail with his [FDUTPA claim] he cannot prevail on his unjust enrichment claim.")  Where, as here, the FDUTPA claim and unjust enrichment claim arise from the same conduct, the unjust enrichment claim has no independent substance and should be dismissed.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Fifth Generation requests that this motion be granted and that the Court either dismiss the First Amended Complaint entirely or, alternatively, order Plaintiffs to file a further amended complaint that provides a more definite statement of facts supporting each claim and that otherwise fully complies with Federal Rule of Civil Procedure 9(b).

**Certification:** The undersigned certifies that he has conferred with counsel for Plaintiffs in accordance with Northern District of Florida Local Rule 7.1(B), and that counsel for Plaintiffs objects to the relief requested in this Motion.

WHEREFORE, Fifth Generation respectfully requests the Court dismiss all counts in the First Amended Complaint.

Respectfully submitted,

<i>s/ John Londot</i>
John Londot
Florida Bar No. 579521
Greenberg Traurig, P.A.
101 East College Avenue
Tallahassee, FL 32301
Phone 850-222-6891
Fax 850-681-0207
londotj@gtlaw.com
hoffmanm@gtlaw.com

22

Rick Shackelford
(Pro Hac Vice motion to be filed)
Greenberg Traurig LLP
1840 Century Park East
Suite 1900
Los Angeles, CA 90067-2121
Phone 310.586.3878
Fax 310.586.1378
shackelfordr@gtlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 28, 2015, the foregoing document was electronically filed with the Clerk of Court using CM/ECF, which will serve the following counsel of record:

> Tim Howard, J.D., Ph.D.
> Howard & Associates, P.A.
> 2120 Killarney Way, Suite 125
> Tallahassee, FL 32309
> Phone 850-298-4455
> Fax 850-216-2537
> tim@howardjustice.com

> *s/John Londot*
> JOHN LONDOT

*LA 131983420v1*